BESSIE I. McKINNEY,

*vs.*

MINNIE F. PRIMROSE.

*New Castle, June 29, 1932.*

*Henry R. Isaacs,* for complainant.

*Clarence A. Southerland,* of the firm of Ward & Gray, for defendant.

THE CHANCELLOR: Upon the primary question of whether there was a contract of some sort between the complainant and Dr. Palmer for the sale and purchase of the land, there can be no doubt. The payment by the complainant and her mother of the costs of a title search, the payment by the complainant on May 4, 1919, of $500 on account of the land and the admission in the so-called little black book which is in evidence, the taking and continuous retention ever since of possession by the complainant, free of rent, not to mention other facts less significant than the

foregoing, yet of some probative force—all convince me beyond doubt that there was a contract between the parties.

The only evidence we have as to the terms of the contract comes from the lips of the complainant and her two children. The consideration is stated by them to have been $2,400, and their testimony is fortified by the entries in the little book which was kept by Dr. Palmer's wife, who seems to have been his agent in this particular matter. Mrs. Palmer was the aunt of the complainant. This relationship supplies an explanation for the liberality of treatment which Dr. Palmer, who was known generally as a kind hearted man, extended to the complainant.

The appearance of an unpaid note for $700 found among Dr. Palmer's papers after his death, signed by the complainant and her mother, bearing the date of May 4, 1914, the day when the contract for the bungalow was made and the day on which the complainant gave the doctor her check for $500 in part payment, is a circumstance which the evidence leaves unexplained. The defendant argues that the existence of such a note is hardly consistent with the contract of sale, for it is said it is difficult to perceive why the complainant and her mother should be borrowing from the doctor $700 at the same time that the complainant was giving him her check for $500.

The complainant repudiates the note, taking pains however not to deny her signature. She says she and her mother could not have signed such a note, for there was no occasion to do so. I am compelled to conclude however that the note was signed by them. I do not tax the complainant with deliberate misrepresentation with respect to the note. I apprehend that the circumstances attending the signing of the note have escaped her memory, after the lapse of eighteen years, and that, not remembering a need for the note, she argues in her mind that she never could have signed it. This is not an unreasonable way to regard the matter, when the other contemporaneous facts are considered.

These facts are as follows: The original plan was for both the complainant and her mother to buy the bungalow. On May 4, 1914, the complainant gave her check to Dr. Palmer for $500, and her mother paid him $1,000. There can be no doubt about that, for it is admitted that Dr. Palmer on a later day returned the $1,000 to the complainant's mother. The explanation is that the mother and the doctor had some sort of misunderstanding, that he returned to her the $1,000 and that she then dropped out of the transaction.

Now why should the complainant's mother on May 4, 1914, have paid the doctor $1,000 and at the same time have signed a note to him for $700? The answer to this question is as difficult under the evidence as the other one of why the complainant at one and the same time should have given him a check for $500 and joined in a note to him of $700.

An explanation of this note matter might be as follows: The bill alleges that the bungalow was contracted for on May 4, 1914, and that the adjoining unimproved lot was contracted for on May 6, 1914, and that the consideration to be paid for both parcels was $2,400. Now if the bungalow which was the only parcel agreed to be sold on May 4th was to be sold for $2,200, the joint note for $700 signed by the complainant and her mother, who were originally contemplated as the purchasers, would fall into a natural setting of concomitant facts, for if the complainant paid $500 and her mother, the then co-purchaser, paid $1,000, there would be a balance due of $700, and it would be quite natural to expect a note to be taken to cover that balance, especially if, as is alleged and testified to, Dr. Palmer was willing to await the convenience of the other parties in the matter of subsequent payments and he was not to take security on the land. If this was what really took place, the note loses all its atmosphere of mystery, for when the doctor subsequently repaid the one thousand dollars to the complainant's mother and she dropped out of the transaction, it is easy

to understand why the note should have been left to stand as it was.

The only trouble with this explanation is that in the little black book the doctor's wife made a note that the consideration for the bungalow was $2,300 and for the lot $100. When she made that entry, does not definitely appear. It was probably in June, 1923. She of course may have been in error in her understanding of how the total of $2,400 should be allocated between the bungalow and the lot. The appearance of the name of the mother of the complainant on the note would strengthen the thought that the note was connected with the simultaneous transaction of a bargain for the bungalow, a transaction to which the two makers were parties.

I conclude from the evidence that the note is of no moment in this case unless it be to show an obligation for the balance then due. There is nothing to show the contrary and the reasonable probability, in view of the obscurity in which time has enveloped the matter, is that such is the case.

There was a contract for purchase. The terms are shown to be that the price for the two parcels was $2,400, a down payment of $500, and (considering the apparently mutual understanding that the complainant's mother should have her refund of $1,000 and thereby dropped from the transaction) that the balance of $1,900 without interest should be paid according to the convenience of the complainant, with no requirement of mortgage or other security.

How much has the complainant paid? On this point there is a regretable lack of definiteness. The evidence is far from as satisfactory as could be wished. I do not place confidence in all of complainant's exhibit No. 9 which to an extent shows a duplication of the entries in the little black book known in the case as complainant's exhibit No. 8. The entries in complainant's exhibit No. 8 are for the most part in the handwriting of Mrs. Palmer who acted for the

doctor. They purport to show payments by the complainant. I cannot agree that the handwriting on the last page is not Mrs. Palmer's. I think it is. The critical figure five, appearing four times, looks to me like hers. So do the letters in the months. I have made the comparison between them and the other figures and letters admitted to have been made by her. These payments total $405. Adding that to the original payment, we have $905. There is a $200 credit entered on the first page. But I reject that, because it appears to me to be an unexplained intrusion, not in Mrs. Palmer's hand. The entries on exhibit 9 contain such an item, but for reasons which an inspection of the paper will reveal, I do not regard it as having been entered by Mrs. Palmer as claimed by the complainant.

Subtracting $905 from $2,400 will leave a balance of $1,495. Dr. Palmer however left among his papers receipted bills showing payments by him for repairs and improvements upon the premises in question placed there for the complainant which according to my computation, and after deducting therefrom what the documentary evidence shows the complainant to have personally borne, amount to $410.72, and also receipted bills for taxes and insurance in the total of $347.15. He thus spent on the property for the complainant $752.87. Adding this to the balance above of $1,495 would make the complainant owe on the property before securing a deed $2,252.87.

The foregoing is the best I can make out of the evidence. The complainant contends that she repaid to Dr. Palmer all that was necessary to cover the disbursements made by him in her behalf. The trouble is, however, that she produces practically no vouchers to show her payments. She has produced a few vouchers for sums as low as twenty dollars, for all of which I have given her credit. But larger sums are uncovered by vouchers.

The complainant claims to have paid at one time so much as two hundred dollars. But she has no cancelled check, no receipt nor any entry in her little book that ap-

pears to be in Mrs. Palmer's handwriting to show such payment. The transaction in question has stretched itself over a period of seventeen years prior to the filing of this bill, during sixteen of which Dr. Palmer was living. If the exact details of the complainant's dealings with him are involved in obscurity and she omitted either to secure, or if secured to retain, the customary evidence in the form of receipts or cancelled check vouchers, it is unfortunate. Courts should not, I conceive, after the witnesses who could speak have died, strain themselves to supply the deficiencies occasioned by a negligent party's carelessness. I do not wish to impute to the complainant a lack of veracity when I say that her testimony is so indefinite as to make it impossible for me to reduce her account with Dr. Palmer to any basis more certain than that which I have above indicated. Indeed if I have erred I fear it has been in the direction of too great liberality in her favor.

I am unable to attach any value to the profits of the so-called apron business which the complainant contends went to liquidate her indebtedness on the property. In view of the manifest expense she was under to keep her family together, and for other reasons which I shall not pause to elaborate upon, it seems to me that there could have been little left from the profits. And besides Mrs. Palmer seems to have managed all of that business except the actual work of making the aprons. The question of these so-called profits is too vague to admit of any definite finding with respect thereto.

I said a moment ago that if I have erred in adjusting the account between the complainant and Dr. Palmer, I feared it had been in the direction of a too great liberality in her favor. For instance the money he spent in the purchase of coal for her, amounting to $225.00, I have not charged against her on the theory that it is not properly to be taken into the house account, or, if it were properly related as a matter of legal principle to that account, that

the doctor made a gift of the coal out of the goodness of his heart.

But as bearing more directly on this question of whether I have not been too liberal with the complainant, I would refer to the matter of interest. I have not charged her with any interest. I very much doubt if I am justified in that omission. For even though the contract did not call for interest on the balance which was to be paid at the convenience of the complainant, yet I can see how interest after a reasonable time would be chargeable. For a contract to make payment at the convenience of the debtor does not mean that, if not convenient, payment need never be made. The law considers such a contract to mean that payment should be made after a reasonable time. *Owen v. Evans*, 134 *N. Y.* 514, 31 *N. E.* 999; *Stone v. Hearn*, 3 *Ky. Op.* 578. It may very well be therefore that fairly early in the eighteen year period that has intervened since the contract date, interest might be charged on the balance.

This principle of law as to the meaning of the contract is enough in itself to answer, I may say, the contention of the defendant that the contract cannot be enforced because of a lack of mutuality in that Dr. Palmer, if living, could not compel the complainant to perform—that is to make payment when she has by the terms of the contract itself the right to choose when to pay.

I have not, as before stated, charged her with interest notwithstanding the interpretation which the law would put upon the contract. The reason for this is that I think (though I must confess the thought, while it has some support under the evidence, yet is not very strongly supported), that Dr. Palmer was content not to exact the interest.

The defendant cites the Delaware cases of *Godwin v. Collins*, 3 *Del. Ch.* 189, and *Diamond State Iron Co. v. Todd*, 6 *Del Ch.* 163, 14 *A.* 27, to support the proposition that if the terms on which deferred payments are to be made are not specified by the parties, specific performance will be refused. Numerous other cases are cited to the same effect.

Those cases are not applicable. The case from 6 *Del. Ch.* is not so nearly pertinent to the defendant's point in this connection as is *Godwin v. Collins, supra.* I shall therefore confine my observation on the Delaware cases solely to *Godwin v. Collins.* What distinguishes that case from the one now in hand is that in that case the bill sought a specific performance of the contract in that one, among others, of its particulars which was the subject of indefiniteness. It was so in the other cases cited by the defendant, all of which I have examined. Here, however, conceding indefiniteness as to when the balance was to be paid, it becomes of no moment because the complainant tenders herself as ready and willing to pay whatever is decreed as the balance due. The court is not asked to fix a time for future payments, or how, if at all, security is to be taken. If the full balance is paid when the deed is decreed to be delivered, how can the question of when the contract calls for payment in the future be other than a theoretical one? See *Singer, et al., v. Campbell,* 217 *Ky.* 830, 290 *S. W.* 667.

It is lastly urged that the complainant has been guilty of such laches that equity should deny her any relief. I do not think so. The defendant has been in possession during all of these years, she has spent money on the property and not very long before Dr. Palmer's death he expressed a willingness to carry out the contract. Every case which the defendant cites in support of her defense of laches, is a case where the complainant was out of possession. Those cases are manifestly different in principle from one where the vendee is and has ever since the contract been in possession under it, not only without objection on the part of the vendor but with his consent. This is not a case, such as those cited, where an owner of land in possession contracts to sell it, and the defendant sits by for a length of time running into years, and then comes forward to ask equity to assist him in a specific performance of the contract against the owner who is still continuing in possession. Equity will not aid one who is guilty of unreasonable

delay under circumstances of that sort, especially when it appears, as it does in some of the cited cases, that the vendee's delay has been in order to speculate upon a possible rise in value.

Decree in accordance with the foregoing.